Argued and submitted November 19, 2002, order modified in part; otherwise
affirmed February 19, 2003

SPRINT PCS,
*Respondent,*

*v.*

WASHINGTON COUNTY,
*Respondent,*

*and*

John FRITZ
and Sharon Fritz,
*Petitioners.*

LUBA 20-02042; A119313

63 P3d 1261

Edward J. Sullivan argued the cause for petitioners and respondent Washington County. With him on the brief were William K. Kabeiseman, Alan A. Rappleyea and Preston Gates & Ellis LLP.

Kelly S. Hossaini argued the cause for respondent Sprint PCS. With her on the brief was Miller Nash LLP.

Before Edmonds, Presiding Judge, and Kistler and Schuman, Judges.

KISTLER, J.

## KISTLER, J.

John and Sharon Fritz petition for review of a Land Use Board of Appeals (LUBA) decision. They assert that LUBA erred when it remanded a Washington County decision that rejected Sprint PCS's application to site a cell phone tower on exclusive farm use (EFU) land. We affirm LUBA's decision as modified below.

Sprint provides wireless telecommunication services. Having decided to improve its wireless communications coverage along a portion of Highway 219, it applied for a permit from Washington County to locate a cell phone tower on EFU land. In its application, Sprint identified three objectives for the proposed tower: enhance telecommunications service along the identified section of Highway 219; enhance telecommunications service to the rural area surrounding the section of Highway 219; and create antenna space to be leased to other wireless communications service providers. Sprint determined that an antenna with a height between 825 and 875 feet above mean sea level was necessary to provide the desired coverage. It identified a "search ring" that encompassed the area where the facility could be located to provide the necessary coverage.[1]

There were 63 potential sites within the search ring; 26 were zoned AF-10[2] and the rest were zoned EFU. Sprint rejected 17 of the AF-10 sites because the elevations were too low to site a 100- to 150-foot antenna. It contacted the owners of the nine remaining AF-10 sites to lease land for its tower but was unable to do so. Based on its inability to secure a lease for any of the nine AF-10 sites, Sprint determined that the sites were not reasonable alternatives and that, to meet its identified objectives, it was necessary to site its cell phone

---

[1] The creation of a search ring is the first phase in siting a wireless communication facility. To create a search ring, a "ring" is drawn on a map over an area that the service provider has determined to be sufficient to provide the desired coverage to customers. The area within the "ring" is then analyzed to determine whether suitable sites are available for a proposed facility based on additional criteria such as elevation.

[2] AF-10 allows agricultural or forestry uses with a 10-acre minimum. The AF-10 sites in this case were included within rural residential zones.

tower on EFU land. Sprint accordingly submitted an application to Washington County for a permit to site a 154-foot monopole tower with 12 antennas on a designated parcel of EFU land.

The county planning staff, after reviewing Sprint's application, initially recommended that the permit be denied because Sprint had failed to justify both its coverage needs and the starting point of the search ring that it had used. On December 20, 2001, a county hearing officer conducted a hearing at which Sprint presented additional evidence regarding its coverage needs. The Fritzes intervened and presented evidence at this hearing, mainly in the form of testimony from an engineer, Donald Weber. Weber questioned several aspects of Sprint's request, including elevation determinations made by Sprint, tower height, search ring size, and location. Weber explained that one possible alternative would be collocating Sprint's antenna on an existing tower.

Sprint asked that the hearing record be held open and, on January 18, 2002, presented rebuttal evidence to Weber's testimony. On February 1, 2002, the Fritzes responded to Sprint's rebuttal with additional testimony from Weber and a memorandum from their attorney urging the hearing officer to deny the application. On February 1, 2002, the county planning staff issued an addendum to its staff report recommending approval of Sprint's application based on the information that Sprint provided. On February 8, 2002, Sprint submitted additional information to the county that included an analysis of 15 additional sites outside its initial search ring. On March 13, 2002, the hearing officer issued a decision denying the application. The hearing officer did not make independent findings of fact or conclusions of law in his decision but instead adopted the Fritzes' February 1, 2002, memorandum.

Sprint appealed the county's decision to LUBA, asserting that the county had improperly interpreted ORS 215.275. LUBA agreed with Sprint, finding that the county had erred (1) in balancing farmland preservation against the technical and engineering feasibility and land options available to Sprint; (2) in considering alternatives that were outside the scope of ORS 215.275; and (3) in not making independent findings and conclusions. LUBA remanded the case

to the county to make findings in light of its explanation of the applicable legal principles.

On judicial review, the Fritzes focus primarily on LUBA's explanation of the legal principles that the hearing officer should apply on remand. Specifically, they argue that (1) LUBA incorrectly held that there was no need to balance competing interests such as farmland preservation and technological feasibility in determining whether it is necessary to site a utility facility on EFU land; (2) LUBA erroneously determined that the county was precluded from examining any reasonable alternatives not contemplated in the utility's business plan; and (3) LUBA erred in remanding the decision because there were valid bases for denial in the decision that Sprint had not challenged.

We begin with the Fritzes' first assignment of error—that LUBA erred in holding that local governments should not balance the need to preserve farmland in interpreting the terms of ORS 215.275.[3] Two statutes are relevant. ORS 215.283(1)(d) provides that "utility facilities necessary for public service" may be sited on EFU land. ORS 215.275(1) provides that a utility facility is necessary for public service within the meaning of ORS 215.283(1)(d) "if the facility must be sited in an exclusive farm use zone in order to provide the service." ORS 215.275(2) sets out what an applicant must prove in order to demonstrate that a utility facility is necessary. An applicant must show that "reasonable alternatives have been considered" and that the facility "must be sited in an exclusive farm use zone due to one or more of the following [six] factors." ORS 215.275(2). Among those factors are "technological and engineering feasibility." ORS 215.275(2)(a).

Relying on *McCaw Communications, Inc. v. Marion County*, 96 Or App 552, 773 P2d 779 (1989), the Fritzes argued below that the terms "reasonable alternatives" and "feasibility" in ORS 215.275(2) and ORS 215.275(2)(a) should be interpreted in light of the goal of preserving farmland set out in ORS 215.243. LUBA disagreed with that argument, reasoning:

---

[3] The text of ORS 215.275 is set out in the Appendix to this opinion.

"[I]n adopting ORS 215.275, the legislature struck a particular balance between the siting of utility facilities in EFU zones and the statutory policy to preserve farmland for farm uses. Once that balance is struck, however, the county's task is to apply the terms of the statute. We see no support in ORS 215.275 for requiring direct consideration of agricultural land preservation policies, external to the statute, in applying its terms."

(Footnote omitted.)

On appeal, the Fritzes reassert their argument that the policy of farmland preservation articulated in ORS 215.243 and applied in *McCaw Communications* should inform the understanding of the terms "reasonable alternatives" and "feasibility" in ORS 215.275. According to the Fritzes, *McCaw Communications* and other cases "require that the terms 'reasonable' and 'feasible' be analyzed by narrowly interpreting provisions that authorize siting non-farm uses on EFU zoned land and [by] interpret[ing] the utility's [obligation to consider] reasonable alternatives very broadly to include the whole spectrum of technological and locational alternatives."

■ We agree with LUBA that the provisions of ORS 215.275 strike the balance between the need to site facilities on EFU land and the need to preserve farmland. In *McCaw Communications*, we interpreted the phrase "[u]tility facilities necessary for public service" in ORS 215.283(1)(d). 96 Or App at 554. At that time, ORS 215.275 had not been enacted and, as the Fritzes note, we concluded that, in light of the goal of farmland preservation, the term "necessary" meant "necessary to situate the facility in the agricultural zone in order for the service to be provided." *Id.* at 556.

ORS 215.275 codifies and gives further definition to our decision in *McCaw Communications*. Subsection (1) of that statute restates, almost verbatim, the standard that we announced in *McCaw Communications*, and subsection (2) identifies what an applicant must show to establish that it is necessary to site a facility on EFU land. An applicant must show that "reasonable alternatives" to siting the facility on EFU land were considered but that, because of one of the six factors set out in paragraphs (2)(a) to (f), it was necessary to

site the facility on EFU land. Textually, the factors set out in ORS 215.275(2) define when it is "necessary" to reject reasonable alternatives. Having identified those six factors as the bases for rejecting otherwise reasonable alternatives, the legislature implicitly precluded consideration of additional factors in deciding when utility facilities must be sited on EFU land.

To the extent that the text of ORS 215.275 is ambiguous, the legislative history resolves the ambiguity. ORS 215.275 was enacted to provide a uniform method for determining whether a public utility facility is "necessary," as that term is used in ORS 215.283(1)(d) and ORS 215.213(1)(d).[4] Tape Recording, House Committee on Water and Environment, HB 2865, May 17, 1999, Tape 168, Side B (testimony of Burton Weast). The six factors in ORS 215.275(2) were intended to provide "a roadmap to courts and county hearings officers for what they are to consider and what not to consider when defining necessity." *Id.* The legislative history confirms what the text says: When deciding whether it is necessary to site a public utility facility on EFU land, local governments must analyze any alternatives based on ORS 215.275. They may not import additional policy considerations into their analysis.

The Fritzes raise a second issue. They argue that LUBA misinterpreted the statutory phrase "reasonable alternatives." *See* ORS 215.275(2). In its decision, LUBA reaffirmed that collocation—placing one utility's telecommunications equipment on another utility's existing cellular tower—is not a "reasonable alternative" when the utility's defined objectives are "(1) [to] provide its own telecommunication services to a defined coverage area and (2) provide space on its own tower to lease to other telecommunications providers." As LUBA explained, "[C]ollocation would serve only one of the purposes of the requested cellular tower and therefore is not a reasonable alternative that must be considered." LUBA then explained, more generally, what local governments may and may not consider in deciding whether an applicant has complied with ORS 215.275:

---

[4] The language in ORS 215.213(1)(d) is identical to that in ORS 215.283(1)(d).

"Reading [LUBA case law] together with *Dayton Prairie* [*Water Assn. v. Yamhill Cty.*, 170 Or App 6, 11 P3d 671 (2000),] it is clear that a utility provider has a considerable amount of discretion in choosing the general type of facility or solution to providing a utility service. The utility provider also has some discretion in defining the essential features of the chosen type of facility, for example, to provide telecommunication services to a defined coverage corridor or area. The utility provider and local government are not required to consider under either *Dayton Prairie* or ORS 215.275(2) any alternative that requires a different type of facility (*e.g.*, groundwater wells versus river intake), or that would not meet the essential features of the chosen facility, as defined by the utility provider. However, as *City of Albany* [*v. Linn County*, 40 Or LUBA 38 (2001),] indicates, the applicant and local government must consider under ORS 215.275(2) an alternative that appears to satisfy the applicant's defined objectives, even if the alternative is a facility in a non-EFU location that requires a different component design than the preferred EFU location (*e.g.*, water tower versus [a] reservoir on a hill)."

Because LUBA concluded that the county had not made independent findings of fact, LUBA did not apply the legal test it articulated to the county's findings. Rather, it remanded the case to the county for further consideration in light of the principles it announced.

On review, the Fritzes agree with LUBA that the phrase "reasonable alternatives" does not require an applicant to consider different methodologies of providing the same utility service. The Fritzes acknowledge, for example, that Sprint was not required to consider land lines as a reasonable alternative to radio frequency communications through cell towers. But they argue that the obligation to consider reasonable alternatives requires applicants to consider different applications of the same methodology, such as "collocation, more antennae on [the same tower], different engineering applications, and the like." Beyond that, the Fritzes argue that LUBA has given too much deference to the applicant's business plan. They argue that merely "[b]ecause the applicant may have a desire to construct a commercial tower on EFU land to maximize profit by selling space on

that tower, the County is not obligated under [ORS 215.275] to defer to that desire under state land laws."

Sprint responds that the phrase "reasonable alternatives" in ORS 217.275(2) refers only to reasonable alternative sites and that the Fritzes improperly seek to convert that phrase into an open-ended invitation to counties and opponents to "second-guess 'complex business and technological decisions' and to 'require a utility provider to reconsider its fundamental technology or its business plan as a "reasonable alternative." ' " As to LUBA's deference to an applicant's business plan, Sprint contends that LUBA's analysis provides "a practical and legally supported starting point for the ORS 215.275 inquiry." Sprint reasons that a "utility provider must be allowed to build a facility that meets its service objectives" and that LUBA's decision permits that goal.

What the statutory phrase "reasonable alternatives" means presents a question of statutory interpretation, and we begin with the text and context of that phrase. As noted, ORS 215.275(1) provides that a utility facility is "necessary for public service" within the meaning of ORS 215.283(1)(d) "if the facility must be sited in an exclusive farm use zone in order to provide the service." ORS 215.275(2) sets out what an applicant must demonstrate (and what a local government may consider) in determining whether a "utility facility" is necessary. The applicant must demonstrate that "reasonable alternatives have been considered" and that, despite those possible alternatives, the facility must be sited in an EFU zone "due to one or more of the following [six] factors." ORS 215.275(2). Put another way, the factors set out in ORS 215.275(2) identify the reasons why potentially reasonable alternatives to siting the facility on EFU land may be rejected. The question, of course, remains what constitutes a "reasonable alternative" that utilities must and counties may consider.

■ On that point, we agree with LUBA and the parties that "reasonable alternatives" does not require consideration of different methodologies for providing a utility service. ORS 215.283(1)(d) and ORS 215.275 address when utilities may be sited on EFU land. Those statutes do not limit a utility's decision about the methodology or the need for providing the

service. *See Dayton Prairie Water Assn.*, 170 Or App at 11 (explaining that ORS 215.283(1)(d) "leaves decisions concerning the methods of providing particular public services to be made by local governments under other appropriate criteria and considerations"). We also hold that "reasonable alternatives" refers to reasonable alternative sites to EFU land. As noted, ORS 215.275, as a whole, addresses where a proposed facility should be sited. Subsection (2) of that statute sets out factors to be considered in deciding when those reasonable alternatives may be rejected and the facility may be sited on EFU land. Finally, subsection (3) explains how cost should be factored into the decision "when considering alternative locations." Considering the phrase "reasonable alternatives" in context, we conclude that it is limited to considering reasonable alternative sites to EFU land.[5]

ORS 215.275(3) demonstrates, however, that the obligation to consider reasonable alternative sites may include an obligation to consider different designs to adapt a utility's chosen methodology to non-EFU land. That subsection identifies when the "[c]osts associated with any of the factors listed in subsection (2)" of ORS 215.275 may be considered. It explains that "[l]and costs shall not be included when considering alternative locations for substantially similar utility facilities" and directs the Land Conservation and Development Commission to determine by rule how land costs may be considered "when evaluating the siting of utility facilities that are not substantially similar." ORS 215.275(3). Subsection (3) thus implies that the obligation to consider reasonable alternatives may include consideration of facilities on non-EFU land that are "not substantially similar" to the facilities sited on EFU land.

Finally, the parties disagree on the role that an applicant's business plan should play in determining when a different design on a non-EFU site should be considered a reasonable alternative. LUBA explained that "at some point differences [in design] become so marked that the alternative can no longer be viewed as 'reasonable.'"[6] LUBA sought to

---

[5] No legislative history bears on the question what "reasonable alternatives" means.

[6] We note that utility facilities may differ in several ways. The first is in their method of providing the service (*e.g.,* phone service using land lines versus wireless

mark that point by deferring to the utility's "defined objectives." LUBA did not base its standard on the text, context, or legislative history of the statute. Rather, it explained in a footnote:

> "We recognize that giving deference to the utility provider's defined objectives (*e.g.*, providing its telecommunication service to a defined corridor or area) invites a results-oriented approach to defining objectives. However, a line between 'reasonable' and 'unreasonable' alternatives must be drawn somewhere, and a line that hinges on the applicant's defined objectives at least has the virtue of being a fairly bright line. In most cases, it will be clear whether or not a proposed alternative can meet the defined objectives. Any other approach would require second-guessing complex business and technological decisions."

As noted, the Fritzes argue that LUBA's approach of deferring to an applicant's defined objectives runs the risk of elevating the utility's business goals over the statutory goal of protecting farmland. More specifically, the Fritzes argue that, when a utility's announced objective does not advance the goal of providing utility service, the fact that a non-EFU site cannot meet that objective does not disqualify it from being considered as a reasonable alternative. Sprint responds that LUBA's approach appropriately recognizes that "a utility provider must be allowed to build a facility that meets its service objectives."

We agree with LUBA that, at some point, the differences in alternative design become so great that a non-EFU site cannot be said to be a reasonable alternative to an EFU site. We also find merit in both parties' arguments. We agree with Sprint that a utility's decision about its service needs should be respected and that a site that does not meet those

communication or electrical generation using fossil fuels versus electrical generation using wind power). Another difference may involve the facility process (*e.g.*, water utility facility with a groundwater well source versus one with a river intake source or a fossil fuel electrical generation plant that uses coal versus one that uses oil). Finally, facilities may differ in their component design (*e.g.*, river intake water facility with an elevated storage reservoir versus river intake water facility with an elevated water tower storage facility). The phrase "reasonable alternatives" includes only those facilities that differ in their component design. As noted, a utility is not required to consider a different methodology or facility process to comply with ORS 215.283(1)(d) and ORS 215.275. *See Dayton Prairie Water Assn.*, 170 Or App at 11.

needs is not a reasonable alternative. We also agree, however, with the Fritzes that a utility's objectives that do not advance the goal of providing a utility service should not disqualify a site from being considered a reasonable alternative. The problem lies, as LUBA recognized, in articulating a standard that captures that distinction.

■     LUBA's answer was to require local governments to defer to a utility's defined objectives. That standard, however, finds no support in the text, context, or legislative history of ORS 215.283(1)(d) or ORS 215.275. Rather, ORS 215.283(1)(d) allows as a permitted use on EFU land "[u]tility facilities necessary for public service." Utility facilities are permitted uses on EFU land because they advance those service needs. That statutory goal provides the appropriate criterion for local governments to apply in determining what constitutes a reasonable alternative. When a utility's defined objective is inconsistent with placing a facility on an otherwise reasonable non-EFU site, local governments should ask whether that objective advances the statutory goal of providing the utility service. We accordingly agree with the Fritzes that LUBA's test gives too much deference to a utility's defined objectives.

In the context of this case, Sprint wishes to provide communication services, and collocating on an existing cellular tower rather than constructing a new one on EFU land would appear, at least at first blush, to be a reasonable alternative site that Sprint should and the county may consider. Sprint, however, wants to build a new cellular tower so that it can provide its own telecommunications service and also lease space to other telecommunications providers. If, as the Fritzes argue, a utility wants to construct a commercial tower on EFU land to maximize profit by selling space on that tower's utilities, a county could find that that objective does not advance the statutory goal of providing utility service and thus would not preclude collocation from being considered as a reasonable alternative to building a new cell tower. Conversely, Sprint argues:

"[U]tility providers routinely plan for more capacity than what is absolutely, minimally required at a given time, especially when constructing a facility with a life span of 30

years or more. It is simply an efficient and cost-effective way to plan a facility and provide service."

If a county were persuaded that the additional capacity was a reasonable part of the utility's plan to provide the service, the county could find that building a new tower rather than collocating on an existing one would advance the statutory goal of providing utility services. The county then could conclude that collocation was not a reasonable alternative. That question, however, presents a factual issue for local governments, subject to review by LUBA.

Finally, the Fritzes argue that LUBA erred when it remanded the county's decision because the county cited grounds for denial that were not challenged by Sprint. They do not, however, identify those grounds of denial in this court. Without such guidance, we decline to search for them.

In summary, we agree with LUBA that the county erred in adopting the Fritzes' memorandum and not making independent findings of fact and conclusions of law. We also agree with LUBA that the case must be remanded to the county for further findings, but in accordance with the standard that we have described.

Order modified to provide for remand and reconsideration in accordance with standard described in opinion; otherwise affirmed.

## APPENDIX

### ORS 215.275

"(1)  A utility facility established under ORS 215.213 (1)(d) or 215.283(1)(d) is necessary for public service if the facility must be sited in an exclusive farm use zone in order to provide the service.

"(2)  To demonstrate that a utility facility is necessary, an applicant for approval under ORS 215.213(1)(d) or 215.283(1)(d) must show that reasonable alternatives have been considered and that the facility must be sited in an exclusive farm use zone due to one or more of the following factors:

"(a)  Technical and engineering feasibility;

"(b)  The proposed facility is locationally dependent. A utility facility is locationally dependent if it must cross land in one or more areas zoned for exclusive farm use in order to achieve a reasonable direct route or to meet unique geographic needs that cannot be satisfied on other lands;

"(c)  Lack of available urban and nonresource lands;

"(d)  Availability of existing rights of way;

"(e)  Public health and safety; and

"(f)  Other requirements of state or federal agencies.

"(3)  Costs associated with any of the factors listed in subsection (2) of this section may be considered, but cost alone may not be the only consideration in determining that a utility facility is necessary for public service. Land costs shall not be included when considering alternative locations for substantially similar utility facilities. The Land Conservation and Development Commission shall determine by rule how land costs may be considered when evaluating the siting of utility facilities that are not substantially similar.

"(4)  The owner of a utility facility approved under ORS 215.213(1)(d) or 215.283(1)(d) shall be responsible for restoring, as nearly as possible, to its former condition any agricultural land and associated improvements that are damaged or otherwise disturbed by the siting, maintenance, repair or reconstruction of the facility. Nothing in this section shall prevent the owner of the utility facility

from requiring a bond or other security from a contractor or otherwise imposing on a contractor the responsibility for restoration.

"(5) The governing body of the county or its designee shall impose clear and objective conditions on an application for utility facility siting under ORS 215.213(1)(d) or 215.283(1)(d) to mitigate and minimize the impacts of the proposed facility, if any, on surrounding lands devoted to farm use in order to prevent a significant change in accepted farm practices or a significant increase in the cost of farm practices on the surrounding farmland.

"(6) The provisions of subsections (2) to (5) of this section do not apply to interstate natural gas pipelines and associated facilities authorized by and subject to regulation by the Federal Energy Regulatory Commission."